IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ULTRAFLO CORPORATION,               §
                                    §
                Plaintiff,          §
                                    §
VS.                                 §   CIVIL ACTION H-09-0782
                                    §
PELICAN TANK PARTS, INC.,           §
PELICAN WORLDWIDE INCORPORATED,     §
and THOMAS JOSEPH MUELLER,          §
                                    §
                Defendants.         §

**OPINION AND ORDER**

Pending before the Court in the above referenced cause, alleging in a Third Amended Complaint (instrument #169) misappropriation of trade secrets, civil conspiracy for the alleged misappropriation, and copyright infringement and seeking a permanent injunction and declaratory judgment, are *inter alia* the following "renewed" motions for partial summary judgment[1]:

    1.  Defendants Pelican Worldwide, Inc. ("Worldwide"), Pelican Tank Parts, Inc. ("Tank"), and Thomas Joseph Mueller's ("Mueller's") renewed motion for partial summary judgment (instrument # 138) that this suit is barred by the statute of limitations;

    2.  Tank, Worldwide, and Mueller's renewed motion for partial summary judgment (#140) on the grounds that there

---

[1] These motions were originally filed as instruments #70-76, but were denied as premature without prejudice to being re-urged in the future (#116).

are no trade secrets or other proprietary information that would support a claim of conversion, unfair competition by misappropriation, misappropriation of trade secrets, and civil conspiracy; and

3. Tank and Mueller's renewed motion for partial summary judgment (#142) that they have conclusively negated essential elements for Ultraflo Corporation ("Ultraflo") to establish causes of action against them and there is no evidence to support any essential element of injunctive relief or damages against Mueller.

## I.  Procedural History

The dispute between the parties has a lengthy procedural history, summarized as follows by the Court in #116 at pp. 2-3:

> Ultraflo sued Defendants Mueller and Pelican Tank in state court alleging various state law claims, including conversion, civil conspiracy, unfair competition, and misappropriation of trade secrets. *Ultraflo Corp. v Pelican Tank Parts, Inc.*, No. 4:08-cv-1460 (S.D. Tex. 2008), Doc. 1-5 at 1. Defendants removed that case to the United States District Court for the Southern District of Texas on the basis of federal question jurisdiction, asserting that Plaintiff's state law claims were completely preempted by the Copyright Act, 17 U.S.C. § 101. No. 4:08-cv-1460. Judge Werlein found that Defendants' removal was untimely, declined to address the potential preemption of Plaintiff's state law claims, and remanded the case to the 280th Judicial District Court of Harris County, Texas. *Id.,* Doc. 21. Defendants filed a notice of appeal to the Fifth Circuit (No. 4:08-cv-1460, Doc. 24) which they subsequently withdrew. *Id.,* Doc.

25.[2]

Before the case was resolved in state court, Defendant Mueller brought a declaratory judgment action in the United States District Court for the Eastern District of Texas, alleging that Ultraflo infringed copyrights that Mueller held to the technical drawings that Ultraflo claimed were its "trade secrets." *Mueller v. Ultraflo Corp.*, No. 1:09-cv-160-MAC (E.D. Tex. 2009). Mueller and Pelican Tank also moved to dismiss the pending case in state court.

Ultraflo alleges that, out of "a desire to avoid costly procedural fights on two fronts," it did not respond to the motion to dismiss in state court. The state court subsequently dismissed the case before it. Mueller filed a voluntary notice of dismissal of his case in the Eastern District, which the court granted.

In March of 2009, Ultraflo brought this case against Defendants Pelican Tank and Mueller in the Southern District of Texas, alleging the same state law causes of action it brought in its initial suit before Judge Werlein: conversion, unfair competition, misappropriation of trade secrets, and civil conspiracy. Doc. 1 at 6. Ultraflo also requested a declaratory judgment against Defendants Pelican Tank and Mueller, asserting that "Defendants have raised issues of federal copyright law and have asserted federal Copyright Act rights to assets that belong to Ultraflo." Doc. 1 at 2. It was on this final request that Ultraflo based its assertion of federal subject matter jurisdiction.

In October of 2010, Ultraflo filed an amended complaint in this case, adding Pelican Worldwide as a defendant and adding a state law claim of unfair competition by misappropriation against all defendants. Doc. 66. On April 18, 2011, the Defendants filed four separate motions for partial summary judgment. Docs. 70, 71, 73, 75.

Only after the Court, in its Opinions and Orders of October 18, 2011 (#116) and September 7, 2012 (#160), ruled in the instant action that Ultraflo's claims for unfair competition, conversion,

---

[2] The order of remand was entered on December 8, 2008, the appeal was filed on January 6, 2009, and the Notice of Withdrawal was filed on January 6, 2009.

and civil conspiracy relating  to these two torts are preempted by the federal Copyright Act, did Ultraflo supplement its Second Amended Complaint[3] (Supplement to the Second Amended Complaint, #161).   In that Supplement, as ordered, Ultraflo identified provisions of the Copyright Act that Ultraflo was relying on in its request for declaratory judgment on Defendants' counterclaim that Mueller owned the copyright in the valve drawings, which Ultraflo claims that he had made while employed by Ultraflo[4] before he went to work for the Pelican Defendants, Ultraflo's competitors,[5] and which Defendants allegedly infringed.  Then Ultraflo filed a motion for leave to file a Third Amended Complaint (#162), adding Worldwide as a Defendant and asserting a claim for copyright infringement directly against Worldwide under the federal statute. On November 14, 2012 Judge Stacy granted the motion (#168), and the Third Amended Complaint (#169) was filed.

The Court's dismissal of the claims for unfair competition,

_____

[3] In the Second Amended Complaint (#118), in response to Defendants' claims against Ultraflo under the federal Copyright Act, Ultraflo sought a declaratory judgment declaring that it had not infringed any rights of Defendants under that law and that Defendants did not possess any valid right under it.

[4] According to Mueller's deposition, #140. Ex. A at pp. 15, 19, he worked for Ultraflo from 1992-summer of 2005.

[5] Ultraflo claims that it is the owner of the drawings of Ultraflo's proprietary and confidential valve designs, that Mueller had access to them during his employment and used them to craft drawings that after his termination he provided to the Pelican Defendants, his subsequent employers, to assist them in manufacturing a valve substantially similar to Ultraflo's.

conversion, and civil conspiracy to engage in unfair competition by misappropriation moots substantial portions of the motions for partial summary judgment, which were filed before the September 7, 2012 Opinion and Order and the Third Amended Complaint and which also do not address the Copyright Act claims.   Thus the Court reviews the motions for partial summary judgment only with respect to the still pending causes of action.

## II.  Standard of Review

Summary judgment under Federal Rule of Civil Procedure 56(c) is appropriate when, viewing the evidence in the light most favorable to the nonmovant, the court determines that "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."   A dispute of material fact is "genuine" if the evidence would allow a reasonable jury to find in favor of the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   Initially the movant bears the burden of identifying those portions of the pleadings and discovery in the record that it finds demonstrate the absence of a genuine issue of material fact; the movant may, but is not required to, negate elements of the nonmovant's case to prevail on summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lujan v. National Wildlife Federation*, 497 U.S. 871, 885 (1990); *Edwards v.*

*Your Credit, Inc.*, 148 F.3d 427, 431 (5th Cir. 1998).

If the movant meets its burden and points out an absence of evidence to prove an essential element of the nonmovant's case on which the nonmovant bears the burden of proof at trial, the nonmovant must then present competent summary judgment evidence to support the essential elements of its claim and to demonstrate that there is a genuine issue of material fact for trial. *National Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d 698, 712 (5th Cir. 1994). "[A] complete failure of proof concerning an essential element of the nonmoving party's case renders all other facts immaterial." *Celotex*, 477 U.S. at 323. The nonmovant may not rely merely on allegations, denials in a pleading or unsubstantiated assertions that a fact issue exists, but must set forth specific facts showing the existence of a genuine issue of material fact concerning every element of its cause of action. *Morris v. Covan World Wide Moving, Inc,*, 144 F.3d 377, 380 (5th Cir. 1998). Conclusory allegations unsupported by evidence will not preclude summary judgment. *National Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d at 713; *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996). "'[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . .'" *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990), *quoting Anderson v. Liberty Lobby, Inc.*. 477 U.S. 242, 247-48

(1986).   "Nor is the 'mere scintilla of evidence' sufficient; 'there must be evidence on which the jury could reasonably find for the plaintiff.'"  *Id., quoting Liberty Lobby*, 477 U.S. at 252.  The Fifth Circuit requires the nonmovant to submit "'significant probative evidence.'"  *Id.*, *quoting In re Municipal Bond Reporting Antitrust Litig.*, 672 F.2d 436, 440 (5th Cir. 1978), and *citing Fischbach & Moore, Inc. v. Cajun Electric Power Co-Op.*, 799 F.2d 194, 197 (5th Cir. 1986).   "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Thomas v. Barton Lodge II, Ltd.*, 174 F.3d 636, 644 (5th Cir. 1999), *citing Celotex*, 477 U.S.  at 322, and *Liberty Lobby*, 477 U.S. at 249-50.[6]

The court must consider all evidence and draw all inferences from the factual record in the light most favorable to the nonmovant.  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *National Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d at 712-13.

"'A defendant moving for summary judgment on the affirmative defense of limitations has the burden to establish that defense conclusively.'"    *Janvey  v.  Democratic  Senatorial  Campaign*

---

[6] The court has no obligation to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment.  *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994).  Rather the nonmovant must identify evidence in the record and demonstrate how it supports his claim.  *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

*Committee, Inc.*, 699 F.3d 848 (5th Cir. 2012), *quoting Johnston v. Crook*, 93 S.W. 3d 263, 269 (Tex. App.--Houston [14th Dist.] 2002), and *KPMG Peat Marwick v. Harrison County Fin. Corp.*, 988 S.W. 2d 746, 748 (Tex. 1999).  "'Thus, the defendant must (1) conclusively prove when the cause of action accrued, and (2) negate the discovery rule, if it applies and has been pleaded or otherwise raised, by proving as a matter of law there is no genuine issue of material fact about when the plaintiff discovered, or in the exercise of  reasonable diligence should have discovered, the nature of its injury.'"  *Id., citing KPMG*, 988 S.W. 2d at 748.

## IV.  Motion for Partial Summary Judgment on

## Statute of Limitations (#138)

### A.  Relation Back Doctrine

Under the doctrine of relation back, a complaint amended to add a new party, claim or defense that arises out of the conduct, occurrence or transaction alleged in a timely original pleading and that would otherwise be time-barred, may be treated, for purposes of the statute of limitations, as having been filed on the date of the original complaint. *Krupski v. Costa Crociere S.p.A.*, 130 S. Ct. 2485, 2489 (2010); *Pessotti v. Eagle Mfg. Co.*, 642 F.2d 974, 975 (1st Cir. 1991).  Federal Rule of Civil Procedure 15(c), "Relation Back of Amendments," in pertinent part states,

> (1) ***When an Amendment Relates Back.***  An amendment to a pleading relates back to the date of the original pleading when:

(A) the law that provides the applicable statute of limitations allows relation back;

(B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out--or attempted to be set out--in the original pleading; or

(C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:

> (i) received such notice of the action that it will not be prejudiced in defending on the merits; and

> (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

The result of Rule 15(c)(1)(A) "is that a claim will be deemed to 'relate back' if relation back is permitted under state law, even if it is not permitted under federal law." *Schirle v. Sokudo USA, L.L.C.*, 484 Fed. Appx. 893, 901 (5th Cir. July 31, 2012), *citing Coons v. Indus. Knife Co., Inc.*, 620 F.3d 38, 42 (1st Cir. 2010). Federal law provides that a newly asserted claim relates back to a claim in the initial pleading if the two arose out of the same "conduct, transaction or occurrence," i.e., " a 'common core of operative facts' must unite the original claim and the newly asserted claim." *Id., quoting Mayle v. Felix*, 545 U.S. 644, 659 (2005). "Under Texas law, a newly asserted claim relates back unless it is 'wholly based on a new, distinct, or different transaction or occurrence.'" *Id., citing* Tex. Civ. Prac. & Rem. Code § 16.068 (2008)("If a filed pleading relates to a cause of

action, cross action, counterclaim, or defense that is not subject to a plea of limitation when the pleading is filed, a subsequent amendment or supplement to the pleading that changes the facts or grounds of liability or defense is not subject to a plea of limitation unless the amendment or supplement is wholly based on a new, distinct, or different transaction or occurrence.").

Generally the addition of a new defendant does not relate back to the original complaint unless what is now Rule 15(c)(1)(C) applies. *Braud v. Transport Service Co. of Ill.*, 445 F.3d 8011, 806 (5th Cir. 2006). Regarding Rule 15(c)(1)(C), the court must determine "'what the prospective defendant reasonably should have understood about the plaintiff's intent in filing the original complaint.'" *Al-Dahir v. F.B.I.*, 454 Fed. Appx. 238, (5th Cir. Oct. 17, 2011), *quoting Krupski v. Costa Crociere S.p.A.*, ___ U.S. ___, 130 S. Ct. 2485, 2496 (2010). Furthermore the defendant must have received notice of a plaintiff's mistake "within the period provided by Rule 4 (m) for serving the summons and complaint," i.e., 120 days[7] of the filing of the complaint. *Id., quoting* Rule 15(c)(1)(C). Notice may be imputed based on shared legal counsel when the originally named party and the new party are represented

---

[7] The Advisory Committee Notes to Rule 15 state, "In allowing a name-correcting amendment within the time allowed by Rule 4(m), this rule allows not only the 120 days specified in the rule, but also any additional time resulting from any extension added by the court pursuant to the rule, as may be granted, for example, if the defendant is a fugitive from service of the summons."

by the same attorney.  *Sanders-Burns v. City of Plano*, 594 F.3d 366, 378 (5th Cir. 2010); *Jacobsen v. Osborne*, 133 F.3d 315, 320 (5th Cir. 1998), *citing Barkins v. Int'l Inns, Inc.*, 825 F.2d 905, 907 (5th Cir. 1987).  So, too, where "the parties are so closely related in their business operations or other activities that the institution of an action against one serves to provide notice of the litigation to the other." *Jacobsen*, 133 F.3d at 320, *citing Kirk v. Cronvich*, 629 F.2d 404, 408 n.4 (5th Cir. 1980).

Furthermore "Rule 15(c) 'is meant to allow an amendment changing the name of a party to relate back to the original complaint *only if the change is the result of an error, such as a misnomer or misidentification.*'" *Miller v. Mancuso*, 388 Fed. Appx. 389, 391 (5th Cir. July 15, 2010), *quoting and emphasizing Jacobsen Osborne*, 133 F.3d 315, 320 (5th Cir. 1998).  "'[F]ailing to identify individual defendants cannot be characterized as a mistake.'" *Id., citing id.* at 321.  A failure to name the correct defendant due to a lack of knowledge of the proper party is not a mistake and will not allow a plaintiff to avail itself of the relation back doctrine. *Jacobsen*, 133 F.3d at 321.

A number of courts have held that Rule 15(c) by its express language only applies to pleadings in the same action as the original pleading, if timely filed, and does not relate to the original pleading in a prior suit. *See, e.g., Morgan Distributing Co., Inc. v. Unidynamic Corp.*, 868 F.2d 992, 994 (8th Cir.

1989)("the 1985 complaint could not plausibly be construed as an amendment to an already dismissed 1983 suit without 'temper[ing] the plain meaning' of Rule 15(c)"); *Bailey v. Northern Indiana Public Serv. Co.*, 910 F.2d 406, 413 (7th Cir. 1990)("Rule 15(c), by its terms, only applies to amended pleadings in the same action as the original, timely pleading."); *Benge v. United States*, 17 F.3d 1286, 1288 (10th Cir. 1994)(plaintiffs' contention that their second complaint should relate back to filing of their first timely filed complaint, which was dismissed for lack of proper service of process, is foreclosed by *Pipkin v. U.S. Postal Serv.*, 951 F.2d 272 (10th Cir. 1992), holding that "a separately filed claim, as opposed to an amendment or supplementary pleading, does not relate back to a previously filed claim"); *U.S. ex rel. Koch v. Koch Industries, Inc.*, 188 F.R.D. 617, 631-32 (N.D. Okla. 1999)("The first amended complaint filed in this case cannot plausibly be construed as an amendment to the already dismissed complaint in *Precision I* without altering the plain meaning of Rule 15(c).")(*citing Morgan Distributing* and *Bailey inter alia*); *Protich v. Will County Health Dept.*, No. 02 CV 4796, 2002 WL 31875461, *2 (N.D. Ill. Dec. 24, 2002)(*citing and quoting Bailey*).   In *Carter v. Texas Dept. of Health*, 119 Fed. App. 577, 581 (5th Cir. Nov. 22, 2004)(*per curiam*), *cert. denied*, 545 U.S. 1146 (2005), the Fifth Circuit wrote,

> The district court properly held that the "original pleading" may not be a pleading filed in a different case.  While this Court has not specifically addressed

> whether Rule 15(c) provides for a complaint in one case
> to relate back to a complaint in another case, other
> courts have answered the question in the negative,
> holding that Rule 15(c) pertains only to pleading within
> the same case.

*Id., citing inter alia Morgan Distributor, Bailey,* and *United States ex rel. Malloy v. Telephonics Corp.*, 68 Fed. Appx. 270, 273 (3d Cir. 2003)("We agree that 'Rule 15(c) does not permit a complaint filed in one civil action to relate back to a complaint filed in a separate civil action.'"). *See Budner v. Wellness Intern. Network Ltd.*, Civ. A. No. 3:06-CV-0329-K, 2007 WL 806642, *6 (N.D. Tex. Mar. 15, 2007), *citing Carter* and its predecessors for that proposition.

The initial complaint in the instant action was filed on March 17, 2009; the Third Amended Complaint was filed on November 14, 2012. Thus if the relation back doctrine applies, for purposes of the statute of limitations defense the claims against Worldwide in the Third Amended Complaint are deemed filed on March 17, 2009.

**B.   Substantive Law**

"A trade secret is any formula, pattern, device or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it." *Seatraz, Inc. v. Sonbeck Intern., Inc.*, 200 F.3d 358, 365 (5th Cir. 2000), *citing Computer Assoc. Int'l. Inc. v. Altai, Inc.*, 918 S.W. 2d 453, 455 (Tex. 1996)(quoting from the *Restatement of Torts* § 757 (1939)). "It differs from other secret information

in a business in that it is not simply information as to single or ephemeral events in the conduct of the business. . . . A trade secret is a process or device for continuous use in the operation of the business." *Restatement of Torts* § 757, cmt. b.

To prevail on a trade secret misappropriation claim under Texas law a plaintiff must plead and ultimately prove (1) the existence of a trade secret, (2) breach of a confidential relationship or improper discovery of the trade secret, (3) use of the trade secret without the plaintiff's authorization, and (4) resulting damages. *CQ, Inc. v. TXU Mining Co.*, 565 F.3d 268, 273 (5th Cir. 2009), *citing Gaia Techs, Inc. v. Recycled Prods. Corp.*, 175 F.3d 365, 376 (5th Cir. 1999); *In re TXCO Resources, Inc.*, 475 B.R. 781, 803 (Bkrtcy. W.D. Tex. 2012).

Under Texas law, the statute of limitations for trade secret misappropriation is three years. Tex. Civ. Prac. & Rem. Code § 16.010 provides,

> (a) A person must bring suit for misappropriation of trade secrets not later than three years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered.

> (b) A misappropriation of trade secrets that continues over time is a single cause of action and the limitations period described by Subsection (a) begins running without regard to whether the misappropriation is a single or continuing act.

Moreover, it is clear from the prior suits that although Ultraflo may not have distinguished Pelican Worldwide from Pelican Tank, it believed that it had causes of action against Tank for

-14-

misappropriation of trade secrets and conspiracy to misappropriate trade secrets before it filed its first suit on November 12, 2007 in the 280th District Court of Harris County, Texas.

As a general rule, under Texas law a cause of action accrues when a wrongful act causes a legal injury even if the injury is not discovered until later and even if all the resulting damages have not yet occurred. *Seatrax, Inc. v. Sonbeck Intern., Inc.*, 200 F.3d 358, 365 (5th Cir. 2000), *citing Murphy v. Campbell*, 964 S.W. 2d 265, 270 (Tex. 1997). *See also Provident Life & Accident Ins. Co. v. Knott*, 128 S.W. 3d 211, 221 (Tex. 2003)("As a general rule, a cause of action accrues and the statute of limitations begins to run when the facts come into existence that authorize a party to seek a judicial remedy,"). A cause of action for misappropriation of trade secrets accrues when the trade secret is actually used. *Id., citing Computer Assoc. Int'l. Inc. v. Altai, Inc.*, 918 S.W. 2d 453, 455 (Tex. 1996). "'Use' of a trade secret means commercial use, by which a person seeks to profit from the use of the secret." *Trilogy Software, Inc. v. Callidus Software, Inc.*, 143 S.W. 3d 452, 464 (Tex. App.--Austin, 2004, pet. denied), *citing Atlantic Richfield Co. v. Misty Prods., Inc.*, 820 S.W. 2d 414, 421 (Tex. App.--Houston [14[th] Dist.] 1991, writ denied). Usually a party's ignorance of material facts or lack of knowledge will not stop the statute from running. *Id.*

Two doctrines may apply to extend the limitations period:  the

discovery rule and the fraudulent concealment doctrine. *BP America Prod. Co. v. Marshall*, 342 S.W. 3d 59, 65 (Tex. 2011); *Computer Assoc. Int'l. Inc. v. Altai, Inc.*, 918 S.W. 2d 453, 455-56 (Tex. 1996); *S.V. v. R.V.*, 933 S.W. 2d 1, *6 (Tex. 1996). The discovery rule exception, which is expressly incorporated into § 16.010(a), defers accrual of a cause of action:  '[a] person must bring suit for misappropriations of trade secrets not later than three years after the misappropriation is discovered *or by the exercise of due diligence should have been discovered." Id.* (emphasis added). The discovery rule is applied where the nature of the injury incurred is inherently undiscoverable and the evidence of injury is objectively verifiable.[8] *BP America Prod.*, 342 S.W. 3d at 65, *citing Computer Assoc. Int'l. Inc. v. Altai, Inc.*, 918 S.W. 2d 453, 456 (Tex. 1996). The "inherently undiscoverable" requirement is satisfied when the injured party is not likely to discover the injury during the limitations period despite due diligence. *S.V.*, 933 S.W. 2d at *7. Although the injury need not be impossible to discover, a party's failure to discover the injury, by itself, is insufficient to satisfy the requirement; "discovery of a particular injury is dependent not solely on the nature of the injury but on

---

[8] In *S.V.*, 933 S.W. 2d at *7, the Texas Supreme Court cited cases and provided examples such as a child born with muscular dystrophy after a doctor told the parents that the mother did not carry the gene; negligent vasectomy shown by later pregnancy; stock transfer records and board meeting minutes demonstrating officers' and directors' misconduct; and poor construction made apparent by rapid deterioration of the building.

circumstances in which it occurred and plaintiff's diligence as well. *Id.*

In *Altai* the Texas Supreme Court refused to apply the discovery rule to the statute of limitations for misappropriation of trade secrets. The Texas Supreme Court commented that because "we live in a world of high employee mobility and easy transportability of information[,] . . . it is not unexpected that a former employee will go to work for a competitor and that the competitor might thereby acquire trade secrets." *Altai*, 918 S.W. 2d at 463. It further opined, "Because misappropriation of trade secrets is not a cause of action that is inherently undiscoverable, permitting application of the discovery rule exception in these cases would do no more than permit the litigation of stale claims." *Id.*

The doctrine of fraudulent concealment suspends or tolls the running of the limitations period when it has already begun. *BP America Prod.*, 342 S.W. 3d at 65. It applies when the party asserting fraudulent concealment establishes an underlying wrong and demonstrates that the "defendant actually knew that the plaintiff was wronged and concealed that fact to deceive him." *Id.* at 67, *citing Earle v. Ratliff*, 998 S.W. 2d 882, 888 (Tex. 1999). *See also Seureau v. ExxonMobil Corp.*, 274 S.W. 3d 205, 228 (Tex. App.--Houston [14th Dist.] 2008, no pet.)("To prove fraudulent concealment, the plaintiff must demonstrate that the defendant had

(1) actual knowledge that a wrong occurred, (2) a duty to disclose the wrong, and (3), a fixed purpose to conceal the wrong."). The doctrine of fraudulent concealment tolls the running of limitations only until the fraud is discovered or could have been discovered with reasonable diligence. *Id.* *See also Seatrax*, 200 F.3d at 366 (citations omitted), in which the Fifth Circuit opined,

> "Where a defendant is under a duty to make disclosure but fraudulently conceals the existence of a cause of action from the party to whom it belongs, the defendant is estopped from relying on the statute of limitations until the party learns of the right of action or should have learned thereof though the exercise of reasonable diligence." . . . Mere concealment is insufficient to establish fraudulent concealment. . . . The party asserting fraudulent concealment defense to the statute of limitations bears the burden of showing that the defendant was under a duty to make a disclosure but fraudulently concealed the existence of action from the one to whom it belongs. To determine whether a duty to disclose exists, the court may consider (1) whether the parties entered an expressed contractual agreement restricting disclosure of the information . . .; (2) whether a duty of confidentiality is implied, as a matter of law, from the parties' relationship . . .; (3) the nature and extent of security precautions taken by the possessor of the trade secret to keep the information from the general public[;] and (4) the degree to which the information has been placed in the public domain by voluntary disclosure.

The statute of limitations for conspiracy under Texas law is two years. Tex. Civ. Prac. & Rem. Code Ann. § 16.003(a). To prevail on such a claim a plaintiff must show (1) two or more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) one or more unlawful, overt acts in furtherance of the conspiracy, and (5) damages as a

proximate result. *Massey v. Armco Steel Co.*, 652 S.W. 2d 932, 934 (Tex. 1983).

The original claim in the instant action, which asserted a conspiracy claim, was filed on March 17, 2009. Thus the statute of limitations for conspiracy would reach conduct occurring after March 17, 2007; conspiracy allegations based on conduct before that are time-barred.

As noted, United States Magistrate Judge Frances Stacy granted Ultraflo's motion to file a Third Amended Complaint, which, though challenged, is currently the controlling pleading and newly asserts a direct claim for copyright infringement against Defendants under the federal Copyright Act, 17 U.S.C. § 501 *et seq*. To prevail on a claim for copyright infringement a plaintiff must demonstrate (1) ownership of the copyrighted material and (2) copying by the defendant(s). *Prostar v. Massachi*, 239 F.3d 669, 677 n.56 (5th Cir. 2001), *citing Alcatel USA, Inc. v. DGI Technologies, Inc.*, 166 F.3d 772, 790 (5th Cir. 1999). Although that federal claim is not addressed by the motion for partial summary judgment (#138), as a matter of law, the Fifth Circuit has held that the statute of limitations for civil claims under the federal Copyright Act, 17 U.S.C. § 507(b), is three years, and that the period begins when the plaintiff knew or had reason to know of the injury on which the claim is based. *Jordan v. Sony BMG Music Entertainment, Inc.*, 354 Fed. Appx. 942, 945 (5th Cir. 2009), *citing Pritchett v. Pound*, 473

-19-

F.3d 217, 220 (5th Cir. 2006).  *See also Prather v. Neva Paperbacks, Inc.*, 446 F.2d 338, 341 (5th Cir. 1971)(holding that the statute of limitations for copyright infringement begins to run once "plaintiff is on inquiry that it has a potential claim").  The key inquiry is when the claim accrued, not when the infringement occurred.  *Groden v. Allen*, 279 Fed. Appx. 290, 294 (5th Cir. 2008).

The Court notes that Defendants, when they removed the first state court case between the parties on May 9, 2008, claimed federal question jurisdiction on the grounds that Ultraflo's state law claims were completely preempted by the federal Copyright Act. That removal without question should have alerted Ultraflo to its potential copyright infringement claim.  (As noted, the suit was subsequently remanded based on untimely removal, not the federal jurisdiction issue.)

**C.  Motion  for Partial Summary Judgment on Limitations (#138)**

The Court has overruled Ultraflo's objections (#144) to the Defendants' summary judgment evidence supporting this motion (#187).

According to the Third Amended Complaint, Ultraflo first sued Tank and Mueller in state court on November 12, 2007 for trade secret misappropriation of its 390 valve.[9]  It was based on Ultraflo's inspection of an allegedly infringing butterfly valve

---

[9] The Court has previously summarized the procedural history of the various suits filed in protracted litigation among the parties, as Worldwide does again in its motion at pp. 3-4.

that it acquired in 2007, purportedly from Tank.  Ex. B (Production
Nos.  ULTRAFLOW 00097-106 (listing supplier of butterfly valve as
"Pelican Worldwide, Inc."), Ultraflo Inspection Report dated Aug.
3-6, 2007).  The report issued on August 3, 2007.  The pleading
charged that Mueller assisted Tank in producing the inspected
butterfly valve by using trade secret dimensional information for
Ultraflo's 390-series valve that Mueller obtained while he had been
employed at Ultraflo.  Ex. A.  Worldwide points out that page 1 of
the Inspection Report shows that in it Ultraflo identified
Worldwide as the producer of the valve and that Ultraflo had actual
knowledge of this fact in 2007.  Worldwide argues that Ultraflo
waited more than three years, until October 12, 2010, to sue
Worldwide, which was first added as a Defendant only in the Third
Amended Complaint in this case, even though Ultraflo had actual
knowledge that Worldwide had manufactured and sold a competing
butterfly valve at least as early as the spring of 2007 and had
exhibited the competing butterfly valve at a trade show, the Cargo
Tank Maintenance Seminar and Exhibit Show in Nashville, Tennessee,
attended by Ultraflo representatives, as early as October 2006,
four years before Ultraflo sued Worldwide.  Ex. I, President of
Worldwide Garth E. Belue Decl.; Ex. R (advertisement); Ex. S
(brochure)[10].

---

[10] Defendants submit copies of emails circulated by Ultraflo
in May 2007 that include a copy of the brochure, which identifies
Worldwide via its trademark.  Ex. L (Production Nos.

Ultraflo admits that its representatives attended many of the same trade shows as Worldwide.  Ex. J, Lurk Dep., pp. 97:18-98:4. After the Nashville show, Ultraflo began internal discussions about Worldwide's Series 190 butterfly valve and eventually acquired one [at an unspecified date] labeled "Pelican Worldwide, Inc. 866-455-7659"[11] that was the subject of Ultraflo's inspection report.  Ex. B.  An email from Ultraflo's corporate representative, Mike Lurk, reveals that Ultraflo knew about the Pelican valve and was looking to obtain one as early as March 20, 2007.  Ex. Q.  At all relevant times Ultraflo also had in its own possession the Worldwide brochure about Worldwide's Pelican valves and a butterfly valve that prominently bears the label, "PELICAN WORLDWIDE, INC."  Ex. H. Defendants contend that no one has concealed the identity of Worldwide, whose sale and distribution of butterfly valves have been open and known and presented on the internet at www.pelicanworldwide.com.

## C.  Ultraflo's Response (#143)

Claiming that Defendants attempted to conceal the role of the parties despite a duty under Texas law to disclose it, Ultraflo

---

ULTRAFLO001002-1005); Ex. Q.

[11] The photograph of the valve in Ex. H shows a phone number on the valve handle, 866-455-7659, which Ultraflo could easily have called if it had any questions about the source of the valve in its possession.

responds that when Tank answered in the initial state court suit[12]
between the parties on December 10, 2007, it did not disclose any
misidentification of the parties or that Mueller was employed by
Worldwide rather than by Tank.  Ex. B-1 to #143.  Texas Rule of
Civil Procedure 93(2) and (4) requires defendants to verify certain
defenses in answers, including an allegation that the defendant is
not liable in the capacity in which it has been sued and an
allegation of any other defect in the parties.[13]  Texas law also
mandates that a defendant must raise misidentification as a
verified denial in its answer.  *CHCA E. Houston, L.P. v. Henderson*,
99 S.W.3d 630, 633 (Tex. App.--Houston [14th Dist.] 2003, no pet.).[14]

---

[12] Filed on November 12, 2007.  #138, Ex. A.

[13] "Defect in parties" refers to joinder problems involving
necessary or indispensable parties.  *CHCA Houston*, 99 S.W. 3d at
634.

[14] Defendants object that at that early stage it was not clear
why Ultraflo sued Tank and that a variety of defenses might be
applicable, which is why they chose a general denial under Texas
Rule of Civil Procedure 92 and a counterclaim denying the existence
of a trade secret.  As to Ultraflo's claims about their discovery
answers in state court, Ultraflo never raised a challenge in state
court, and its answers to interrogatories were truthful.
    Moreover, Defendants insist they did disclose Worldwide as a
potential person with knowledge of relevant facts in their Rule 26
disclosures (#139-15, Ex. N, p.7), disclosed documents in
approximately 48 pages of engineering drawings with Worldwide's
name in numerous places (#139, Ex. O, p.7), disclosed Worldwide as
Mueller's employer (#90, brief p.6), and brought to state court and
shared a Worldwide flyer which is filed here as #138-19, Ex. S.
Moreover Ultraflo identified Worldwide in its internal study of the
valve in its possession.   Worldwide's name is available on the
world wide web, including its own website and that of the Secretary
of State.  Defendants charge that Ultraflo filed suit without doing
any basic research.   Ultraflo did not take a single deposition

Moreover in the state court action Ultraflo served Defendants with a request for disclosure under Texas Rule of Procedure 194.2(a),(b), and (l) and asked for the correct names of the parties to the lawsuit, the name, address, and telephone number of any potential parties, and the name, address, and telephone number of any person who may be designated as a responsible third party. Neither Tank nor Mueller revealed any involvement of Worldwide, even during discovery after the case was removed to federal court. Ex. B-2.

Ultraflo also served an interrogatory asking Tank to disclose the terms of Mueller's employment. Ultraflo received an unverified response that "Mueller's employment started on or about September 20, 2005," without any indication whether he was employed by Tank or Worldwide. Ex. B-3 at Interrogatory No. 4 at pp. 4-5. Tank also answered that it did not manufacture a certain type of valve, implying that Ultraflo incorrectly described the valve as opposed to naming the wrong manufacturer. *Id.* In addition, Tank and Mueller filed a counterclaim asserting that Ultraflo's suit was malicious prosecution and an abuse of process to keep Tank, as opposed to Worldwide, from fairly competing with Ultraflo in the marketplace, to discourage it from further employing Mueller, a valuable and knowledgeable employee, and to discourage it from

---

before September 9, 2012, when it deposed Mueller who testified that he worked for Worldwide after he left Ultraflo in 2005 and never worked for Tank.

competing against Ultraflo in a free market economy in unlawful restraint of trade.  Ex. B-10 at ¶ 43 at p.6 and ¶ 44 at p. 6. Defendants now appear to claim that Tank never competed or intended to compete with Ultraflo and that Worldwide is the competitor.

After Tank and Mueller removed the first of the three lawsuits to federal court, Tank still did not disclose Worldwide as a potential party that would need to be added.  Ex. B-4.  Tank and Mueller also filed another counterclaim and third-party claim on October 30, 2008 (Ex. B-11), in which they again charged that Ultraflo was suing to keep Tank, as opposed to Worldwide, from competing with Ultraflo.  *Id.* at 9.  Tank reiterated its allegation that Ultraflo was attempting to interfere with Tank's right to continue to employ Mueller.  *Id.* at 10.

After the remand on December 8, 2008, Mueller filed the second suit in the Eastern District of Texas on February 12, 2009. Ultraflo claims that it decided it would rather have the matter resolved by the federal courts, including what it calls "specious copyright claims by Mueller," and that it moved for an extension (Ex B-6), but before it could respond to a motion to dismiss, "allowed the state court to dismiss the litigation without prejudice so the parties could resolve their issues in one forum." #143 at p.7; #138, Ex. D.  Therefore Ultraflo states that it "was forced to file a new complaint" in this Court, instituting the instant action on March 14, 2009.  #143 at p. 8.

-25-

In their Answer and Counterclaims (#7), Defendants asserted 20 affirmative defenses, none of which suggested that Ultraflo had named the wrong party.  In the Initial Disclosures Defendants again failed to identify Worldwide as a financially interested party or a possible party or to list any Worldwide individual as a person with knowledge of discoverable information.  On December 12, 2009 Mueller objected to an interrogatory asking him to identify the terms of his employment.  After Ultraflo filed a motion to compel, Mueller amended his answer on August 13, 2010 and stated that he had never worked for Tank, but had been an employee of Worldwide. Ex. B-7.

Ultraflo also asked Tank to produce its butterfly valve customers and its sales information.  Initially Tank objected, but after Ultraflo filed a motion to compel, Pelican amended its responses and disclosed for the first time that Tank does not sell valves, but that Worldwide does.  Ex. B-8.  Ultraflo then sought Defendants' consent to add Worldwide as a party, but Defendants refused, so Ultraflo filed a motion for leave to amend (#53),[15] which was granted (#64) on September 28, 2010.

Ultraflo further points out that in filings with the Secretary

---

[15] Ultraflo objects to "Defendants' lack of veracity" in claiming in their original motion that "'Ultraflo waited until October 12, 2010 to bring suit against Pelican Worldwide.'"  #143 at p. 10, n.3.  In their renewed motion at n.2 they further misled the Court in relying on the date of their Answer, October 28, 2010.

of State, Garth Belue is listed as the registered agent for Worldwide and for Tank, and was the only listed director for each, with the same address. Exs. B-9, B-13. Ultraflo charges that Tank and Worldwide are related Pelican entities and that Worldwide knew of the suit the whole time, paid for the defense the entire time, and tried to hide its identity to take advantage of its limitations defense.   At his deposition (Ex. B-16 at p. 20, ll.16-19) Worldwide's President Belue  testified that he set up Tank in 2006 or 2007. Although Defendants argue otherwise, Ultraflo states that it did not know of the difference between the two Pelican entities, Worldwide and Tank.  Ex. A, Decl. of Mike Lurk.  Its confusion is reflected in attachments to Defendants' motion:  Ultraflo employees variously refer to the named defendant as Pelican, Pelican Worldwide, Pelican Valve, and  Pelican Tank.  #138, Exs. B,L,Q. Nor have Defendants submitted any evidence suggesting that anyone at Ultraflo knew the difference between Worldwide and Tank.

As noted, Defendants bear the burden of establishing their limitations affirmative defense.  Their motion is based on the unsupported contention that the statute stopped running as to Worldwide on October 12, 2010 when the Court granted Ultraflo's motion for leave to amend.  Ultraflo argues that it stopped running on November 12, 2007, the date of the original lawsuit between the parties, and would thus include misappropriation back to November 13, 2004 because the Third Amended Complaint "relates back" to the

date of the original complaint.  The conspiracy claim would go back to November 13, 2005, when Mueller was still employed at Ultraflo, so limitations would not apply as a matter of law.   While Defendants imply that Worldwide existed for years and was well known, Ultraflo points out that Defendants only registered the name Pelican Worldwide in March 2004, that its trademark applications state its first use in commerce of that name was not until March 1, 2006 (Ex. B-14), only 18 months before Ultraflo filed suit, and that Worldwide's own marketing materials represent that it did not introduce the subject valves until April 2007 (Exs. B-15 and B-16 at Vol. II, pp. 55-58.  Mike Lurk's declaration (Ex. A) shows that Ultraflo did not become aware of copying until March 29, 2007. Alternatively, if the statute stopped running as of March 17, 2009, the misappropriation claim would go back to March 18, 2006 and the conspiracy claim, to at least March 18, 2007.

Regarding notice to Worldwide for purposes of the relation back doctrine, Ultraflo states that Belue, the founder of Tank and President of Worldwide, admits that he knew about the first lawsuit and discussed it with Mueller.  Ex. 16, Belue Dep. at Vol. I at 37:7-10.  Notice to a new defendant may be imputed when there is an identity of interests between the original defendant and the defendant that the plaintiff seeks to substitute.  *Jacobsen*, 133 F.3d at 320.  The Pelican entities have the same counsel, the same officers, the same address, and the same corporate representatives.

-28-

Ultraflo argues that Worldwide has had notice of the misappropriation claim for years. *See Norton v. Int'l Harvester Co.*, 627 F.2d 18, 21 (7th Cir. 1980)(identity of interest often found when original and added parties are two related corporations with substantially similar officers and directors, share office space, and have similar names), *quoting Hernandez Jimenez v. Calero Toledo*, 604 F.2d 99, 102-03 (1st Cir. 1979)("The identity of interest principle is often applied where the original and added parties are a parent corporation and its wholly owned subsidiary, two related corporations whose officers, directors or shareholders are substantially identical and who have similar names or share office space, past and present forms of the same enterprise, or co-executors of an estate."); *Sanders-Burns*, 594 F.3d at 378).

Ultraflo proclaims that the real legal issue is whether the statute should have stopped running when the original petition was filed in state court on November 12, 2007, which is important only if the Court finds that Ultraflo knew or should have known of the conspiracy claim prior to March 17, 2007, two years before the filing of the first complaint in the instant action. Besides Defendants' speculation that Ultraflo knew Mueller stole the drawings to design a copycat valve for Defendants because of a 2006 trade show displayed an early version, Ultraflo insists there is no evidence suggesting that Ultraflo knew or should have known before March 18, 2007 and Ultraflo denies that it did. Ultraflo urges

that justice requires that the Court find that the statute stopped running on the filing of the original state court action.[16]  It was Defendants' failure to comply with their discovery obligations that forced the filing of a second suit.  The statute of limitations, as an affirmative defense, is subject to equitable considerations such as estoppel and waiver.  Ultraflo contends that because Defendants played games and hid the identity of Worldwide, the true tortfeasor, they should not be able to claim a limitations defense.  They suggest such as a sanction under Fed. R. Civ. P. 37(a)(4) for repeatedly breaching their duty to disclose Worldwide's role, starting with the initial suit.

Ultraflo maintains that the display of the valve at the 2006 trade show is not the key to the running of the statute of limitations; instead it is Ultraflo's knowledge, the time when it discovered the misappropriation or should have discovered it by the exercise of reasonable diligence.  Tex. Civ. Prac. & Rem. Code § 16.010.  A genuine issue of material fact exists as to whether the display of the early version of the valve at the October 2006 trade show should have alerted Ultraflo to Mueller's stealing the drawings to design a copycat valve.

**D.  Defendants' Reply (#145)**

---

[16] The Court reiterates that under Texas law, it is not the date that the original petition/complaint is filed in state court that commences an action, but the date a defendant is served. Ultraflo does not identify that date.

Some of the arguments made in the reply have been incorporated into the discussion above.  Defendants reiterate that Ultraflo had actual knowledge of the identities of the proper parties for years. It had in its possession a physical valve of Worldwide that prominently bore the name of the parties, and an internal report naming Worldwide; Ultraflo knew since 2006 that Worldwide was selling valves; nobody, including counsel, concealed the name of Worldwide, which was all over the web.  Moreover Ultraflo lost in state court and had its case dismissed because it did not bother to file an answer to Defendants' motion to dismiss challenging subject matter jurisdiction.  #63, Ex. D.  Defendants' dismissal of a lawsuit they filed against Plaintiff and subsequently tried to settle is not evidence of concealment but a good faith effort to end the litigation.  Moreover counsel for both sides have cooperated for years in the course of their suits.

Defendants maintain that the relation back doctrine does not save Ultraflo because its standard is "knew or should have known." Although Ultraflo did not sue Worldwide until it filed the Third Amended Complaint in this suit on October 12, 2010, it had an actual in-house corporate report that identified Worldwide and studied Worldwide's valve in detail as of August 3, 2007 (#138-4, Ex. B); it had internal email discussing the valve since May 2007 (#138-17, Ex.Q,; #138-14, Ex. L); and Belue's declaration shows that Ultraflo saw the copycat valves at the trade show in October

2006.  All these are more than three years before the filing of the complaint against Worldwide.

## E.  Court's Decision

Ultraflo's claims of misappropriation of trade secrets and conspiracy to misappropriate trade secrets against Mueller and Tank were initially filed in the first petition in the first state court suit (which became H-08-1460 after removal) on November 12, 2007, by which time Ultraflo was clearly aware and believed that it had the claims against Tank and Mueller.  H-08-1460, #1-5, Ex. B-3. The instant action, H-09-0782, was filed on March 17, 2009, approximately a year and four months later.  The two prior suits were dismissed without prejudice, with those claims again asserted in the Original Complaint in this suit.  Thus the current misappropriation claim against Mueller and Tank can only reach back at most to March 18, 2006, and, given the fact that the claims were asserted in previous actions, the discovery rule and fraudulent concealment doctrine do not apply.[17]  The conspiracy claim against

---

[17]  With regard to the discovery rule, even without the misappropriation claim against Ultraflo's former employee Mueller and Tank in the earlier suits, the Texas Supreme Court's ruling in *Altai* appears to foreclose application of this equitable exception to Ultraflo's misappropriation claim.  The Court emphasized that the requirement that the plaintiff's injury be inherently undiscoverable for the discovery rule to apply substantially limits the circumstances where it applies.  918 S.W. 2d at 456.  Mueller resigned from Ultraflo and immediately went to work for Worldwide in 2005.  As indicated earlier, in *Altai*, 918 S.W. 2d at 463, noting that companies take extensive precautions to protect intellectual property, the Texas Supreme Court opined that because "we live in a world of high employee mobility and easy

Mueller and Tank can only reach back to March 18, 2007, which would appear to cut off much of the conduct presumably underlying that cause of action.

As noted, as a matter of law, if the relation back doctrine applies, the new allegations against the new Defendant, Worldwide, in the Third Amended Complaint, filed on November 12, 2012, in the instant suit can only relate back to the Original Complaint filed in this action, on March 17, 2009, which appears to be largely after the alleged conspiracy took place. Thus most, if not all, of Ultraflo's claim of conspiracy to misappropriate against Mueller, Tank, and Worldwide, with its two-year statute of limitations, is time-barred. The Court finds that the relation-back doctrine does apply to the claims against Worldwide here,

---

transportability of information[,] . . . it is not unexpected that a former employee will go to work for a competitor and that the competitor might thereby acquire trade secrets." It further declared, "Because misappropriation of trade secrets is not a cause of action that is inherently undiscoverable, permitting application of the discovery rule exception in these cases would do no more than permit the litigation of stale claims." *Id.* It further concluded that because "trade secret misappropriation claims are not inherently undiscoverable, it is not necessary for us to reach the question whether such misappropriation may be verified by objective evidence." *Id.* at 458. Moreover although acknowledging that thirty-nine states and the District of Columbia have adopted the Uniform Trade Secrets Act, which provides a discovery rule exception that tolls the statute of limitations in misappropriation of trade secret cases," "no state supreme court . . . has yet adopted the discovery rule exception for trade secret cases as an exercise of its common law jurisdiction" and it "decline[d] to be the first." *Id. In accord, Wagner & Brown, Ltd. v. Horwood*, 58 S.W. 3d 732, 734-35 (Tex. 2001). Therefore this Court will not apply the discovery rule exception to the misappropriation clam here.

including the copyright infringement, because the claims in the Third Amended Complaint arose out of the same conduct, transaction, or occurrence set out--or attempted to be set out--in the original pleading in the instant action.   The claims in the Third Amended Complaint cannot relate back to either of the two prior suits between Ultraflow and Tank and Mueller under *Carter* and its cited precedent.   119 Fed. Appx. at 581.   Given the nature of complete preemption, the claims under the Copyright Act relate back to the conduct described in the state law claims in this suit's original complaint that were preempted.   This Court's analysis in its Opinion and Order (#116 at pp. 9-11, 12-16), in the context of examining whether it had federal question jurisdiction, was based on the fact that the equivalent state law claims of unfair competition, conversion (of intellectual property, which was beyond the scope of the state law cause of action and preempted), and civil conspiracy relating to these two were completely preempted because provisions in the Copyright Act covered all the elements of those causes of action.   Moreover, when an amended complaint states a new basis for subject matter jurisdiction, as is the case here with federal question jurisdiction under the Copyright Act, the amended complaint relates back to the date of the original filing. *See, e.g.,* 6A Charles A. Wright, Arthur R. Miller, and Mary Kay Kane, *Federal Practice and Procedure* § 1497, at p. 80 (2d ed. 1990)("Amendments curing a defective statement of subject-matter

jurisdiction . . . will relate back . . . .”), *citing Carney v. Resolution Trust Corp.*, 19 F.3d 950, 954 (5th Cir. 1994)(“Relation back to the date of the original filing applies even when the amendment states a new basis for subject matter jurisdiction.”).

As for the addition of Worldwide as a Defendant, regarding the required notice under Rule 15(c)(1)(C) Ultraflo has raised a plausible claim that Worldwide had notice and should reasonably have known about the basic misconduct alleged against it from the earliest suit against Tank and Mueller.  Ultraflo has alleged and pleaded facts demonstrating that the Pelican entities are interrelated, share the same attorney, and have the same individual, Garth Belue, listed as registered agent and director with the same address, in filings with the Secretary of State. Moreover Ultraflo points to Belue’s deposition testimony in Ex. 16 stating that Belue knew about the first lawsuit and discussed it with Mueller.  These alleged facts also support the addition of Worldwide as a Defendant to correct a clerical misidentification because of confusion regarding the Pelican entities, but stating facts plausibly showing that Worldwide had notice of Ultraflo’s claims against Tank and Mueller even from the first suit.

Ultraflo also first asserts its misappropriation claim against Worldwide in its Third Amended Complaint.  The relation back doctrine relates that claim back to the Original Complaint filed in this action, on March 17, 2009, and therefore the three-year

statute of limitations for that misappropriation extends back to March 2006. Most of the objective evidence reflects that Ultraflo became aware of and investigated the alleged misappropriation shortly after that month through emails in May 2007 and the issuance of its internal report on August 3, 2007. Moreover Ultraflo has alleged facts stating a plausible basis for applying the fraudulent concealment doctrine to Mueller and Tank's nondisclosure of Worldwide's role in the alleged theft of its trade secrets/copyrighted materials.[18] The allegations that Ultraflo representatives attended the Nashville, Tennessee trade show in October 2006 and saw a brochure stating that Ultraflo manufactured valves seem rather vague and general to link Worldwide (as well as Tank and Mueller) to Ultraflo's 390 valve and trigger an instant duty to investigate, but even that trade show would fall within the three-year limitations. Regardless, as will be discussed with respect to the second motion for partial summary judgment, Ultraflo has submitted evidence showing that the external dimensions of most butterfly valves generally followed industry standards so that competing butterfly valves and their parts, no matter who

---

[18] Purportedly the misappropriation began around 2005 when Mueller went to work for Pelican. The statute only began to run when Worldwide's valve was "used," i.e., commercially sold, a time uncertain, but discovered by Ultraflo in 2007. The statute of limitations goes back to the spring of 2006, so it would cover the Nashville trade show. Tank and Muedller knew that Ultraflo was allegedly wronged when the first of the three suits was filed, but allegedly tried to conceal that fact as applied to Worldwide.

manufactured them, would be interchangeable, but that the inner dimensions and arrangements were not disclosed.  Thus examining Worldwide's valve from the outside or reading the brochures would not reveal the internal secret information.  It is not clear when Worldwide first "commercially used" the suspect valve.  Moreover the Copyright Act's three-year statute of limitations for its claim against Worldwide similarly would reach back to the same time.  At this stage it would appear that the misappropriation and Copyright Act claims against Worldwide are not time-barred.

**V.   Tank, Worldwide and Mueller's Renewed Motion for Partial Summary Judgment on Misappropriation of Trade Secrets**

**A.   Substantive Law**

As noted, to prevail on a claim of trade secret misappropriation, the plaintiff must show that (1) a trade secret existed, (2) it was acquired through a breach of a confidential relationship or discovered by improper means, and (3) it was used without plaintiff's authorization.  *Phillips v. Frey*, 20 F.3d 623, 627 (5th Cir. 1994).  See p. 14 of this Opinion and Order.

"A trade secret 'is one of the most elusive and difficult concepts in the law to define.'"  *Tewari De-Ox Systems, Inc. v. Mountain States/Rosen, LLC*, 637 F.3d 604, 613 (5th Cir. 2011), *quoting Lear Siegler, Inc.*, 569 F.2d 286, 288 (5th Cir. 1978).  Often "the question of whether certain information constitutes a trade secret ordinarily is best 'resolved by a fact finder after

full presentation of the evidence from each side.'"  *Id., citing id.* at 289.

To determine whether a trade secret exists, the court examines six factors:  (1) the extent to which information is known outside the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of the measures taken to guard the secrecy of the information; (4) the value of the information to the business and to its competitors; (5) the amount of effort or money expended in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.  *In re Bass*, 113 S.W. 3d 735, 739 (Tex. 2003), *citing Restatement of Torts* § 757 cmt. b (1939), and *Restatement (Third) of Unfair Competition* § 39 reporter's n. cmt. d ("In determining the existence of a trade secret, many cases rely on factors identified in the *Restatement of Torts* § 757 cmt. B"). The Texas Supreme Court further stated in *Bass*, *id.*,

> The Restatement of Unfair Competition treats the factors as relevant, but not dispositive criteria:  It is not possible to state precise criteria for determining the existence of a trade secret.  The status of information claimed as a trade secret must be ascertained through a comparative evaluation of all the relevant factors, including the value, secrecy of definiteness of the information as well as the nature of the defendant's misconduct.

The Texas Supreme Court in *Bass* agreed with comment in the *Restatement of Unfair Competition* and held that a plaintiff does not need "to satisfy all six factors because trade secrets do not

fit neatly into each factor every time" and that "other circumstances could be relevant to the trade secret analysis." 113 S.W. 3d at 740.

The owner of a trade secret "will lose his secret by its disclosure unless it is done in some manner by which he creates a duty and places it on the other party not to further disclose or use it in violation of that duty." *Taco Cabana Inter., Inc. v. Two Pesos, Inc.*, 922 F.2d 1113, 1123 (5th Cir. 1991); *Carson Prods. Co. v. Califano*, 594 F.2d 453, 461 (5th Cir. 1979)("However strong may be the [plaintiff's] case on other indicia of trade secret status, it is elemental that '[t]he subject matter of a trade secret must be secret. . . . The subject of a trade secret 'must not be of public knowledge or of general knowledge in the trade or business.'"). "[I]nformation generally known and readily available is not protectable. . . . Consistent with this concept of secrecy, a former employee may use the general knowledge, skills and experience acquired during employment to compete with a former employee." *Trilogy Software, Inc. v. Callidus Software, Inc.*, 143 S.W. 3d 452, 467 (Tex. App.--Austin 2004), *citing T-N-T Motorsports, Inc. v. Hennessey Motorsports, Inc.*, 965 S.W. 2d 18, 22 (Tex. App.--Houston [1st Dist.] 1998), and *Gonzales v. Zamora*, 791 S.W. 2d 258, 265 (Tex. App.--Corpus Christi 1990, no writ.).

Nevertheless, "[i]f a voluntary disclosure occurs in a context that would not ordinarily occasion public exposure, and in a manner

-39-

that does not carelessly exceed the imperatives of a beneficial transaction, then the disclosure is properly limited and the requisite secrecy retained. [citations omitted]." *Taco Cabana*, 932 F.2d at 1124, *citing Metallurgical Industries Inc. v. Fourtek, Inc.*, 790 F.2d 1195, 1200 (5th Cir. 1986)(finding under Texas law that secrecy was not surrendered where disclosures were not public announcements and were divulged only to businesses with whom plaintiff dealt with the expectation of profit); *see also Wellogix, Inc. v. Accenture, LLP*, 823 F. Supp. 2d 555, 564 (S.D. Tex. 2011). Moreover the owner of a trade secret may provide it to employees who have pledged to secrecy and others in furtherance of business transactions from which the owner expects to profit without losing trade secret protection. *Metallurgical*, 790 F.2d at 1200,[19] *cited*

---

[19] In *Metallurgical Indus.* the Fifth Circuit opined,

> Although the law requires secrecy, it need not be absolute. Public revelation would, of course, dispel all secrecy, but the holder of a secret need not remain totally silent:

>> He may, without losing his protection, communicate it to employees involved in its use. He may likewise communicate it to others pledged to secrecy . . . . Nevertheless, a substantial element of secrecy must exist, so that except by the use of improper means, there would be difficulty in acquiring the information.

790 F.2d at 1200, *citing Restatement of Torts* § 757 Comment b (1939). In *Metallurgical Indust., Metallurgical* provided the secret information only to two businesses with which it was dealing to further its economic interests, "as part of business transactions by which it expected to profit." *Id.* In remanding

for that proposition, *Recer v. Kramer*, Civ. A. No. 3:97-CV-1258G, 1998 WL 401594, *2 n.4 (N.D. Tex. July 10, 1998).  Nevertheless, "[o]ne who voluntarily discloses information or who fails to take reasonable precautions to ensure its secrecy cannot properly claim that the information constitutes a trade secret."  *Interox America v. PPG Industries, Inc.*, 736 F.2d 194, 202 (5th Cir. 1984).  The burden of proving secrecy is on the party claiming secrecy status, here Ultraflo.  *Trilogy Software*, 143 S.W. 3d at 467.

The Fifth Circuit has rejected the argument that a combination of disclosed technologies cannot constitute a trade secret.  *Tewari De-Ox Systems, Inc. v. Mountain States/Rosen, LLC*, 637 F.3d 604, 613 (5th Cir. 2011)(and cases cited therein).  "'[A] trade secret can exist in a combination of characteristics and components each of which, by itself, is in the public domain, but the unified process, design and operation of which in unique combination, affords a competitive advantage and is a protectible secret.'"

---

the case for a new trial the panel commented,

> Metallurgical's case would have been stronger had it also presented evidence of confidential relationships with these two companies, but we are unwilling to regard this failure as conclusively disproving the limited nature of the disclosures. . . . [C]onfidentiality is only a factor to consider.  Whether a disclosure is limited is an issue the resolution of which depends on weighing many facts. The inferences from those facts, construed favorably to Metallurgical, is that it wished only to profit from its secrets in its business dealings, not to reveal its secrets to the public.

*Id.* at 1200-01.

*Id.*, *quoting Imperial Chem., Ltd. v. Nat'l Distillers & Chem. Corp.*, 342 F.2d 737, 742 (2d Cir. 1965).  Secret modifications of a known process or device can be trade secrets, especially where they are developed through hard work and expense.  *Metallurgical Industries Inc. v. Fourtek, Inc.*, 790 F.2d 1195, 1199 (5th Cir. 1986); *Ventura Mfg. Co. v. Locke*, 454 S.W. 2d 432, 433-34 (Tex. Civ. App.--San Antonio 1970, no writ).

Novelty and uniqueness are not prerequisites for a trade secret.  *Gonzales*, 791 S.W. 2d at 264, *citing Cataphote Corp. v. Hudson*, 422 F.2d 1290, 1293 (5th Cir. 1970).  Unlike patent law, which aims to protect novelty and nonboviousness, the policy behind trade secret law is to maintain standards of commercial ethics; "'The necessity of good faith and honest, fair dealing is the very life and spirit of the commercial world.'"  *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 482-83 (1974), *quoting National Tube Co. v. Eastern Tube Co.*, 3 Ohio Cir. Cr. R., N.S. at 462.  "[Trade secret law's] protection is not based on a policy of rewarding or otherwise encouraging the development of secret process or devices. The protection is merely against the breach of faith and reprehensible means of learning another's secret."  *Water Servs., Inc. v. Tesco Chems., Inc.*, 410 F.2d 163, 172 (5th Cir. 1969).

"'When money and time are invested in the development of a procedure or device which is based on an idea which is not new to a particular industry, and when that certain procedure or device is

-42-

not generally known, trade secret protection will exist.'" *Trilogy Software*, 143 S.W. 3d at 467, *quoting Gonzales*, 791 S.W. 2d at 264. *See also Water Servs., Inc. v. Tesco Chems., Inc.*, 410 F.2d 163, 164 (5th Cir. 1969).

Blueprints and drawings have been recognized as trade secrets. *Genesco Sports Enterprise, Inc. v. White*, Civ. A. No. 3:11-CV-1345-N (BF), 2011 WL 6593415, *8 (N.D. Tex. Oct. 27, 2011)(and cases cited therein); *Am. Precision Vibrator Co. v. Nat'l Air Vibrator Co.*, 764 S.W. 2d 274, 276-78 (Tex. App.--Houston [1[st] Dist.] 1988, no writ); *Texas Integrated Conveyor Systems, Inc. v. Innovative Conveyor Concepts, Inc.*, 300 S.W. 3d 348, 367 (Tex. App.--Dallas 2009), *citing Global Water Group, Inc. v. Atchley*, 244 S.W. 3d 924, 928 (Tex. App.--Dallas 2008, pet. denied).  Ultraflo has claimed that its drawings and the dimensional information of its 390 butterfly valves are trade secrets.

Under the second element of trade secret misappropriation, "[i]mproper means of acquiring another's trade secrets include theft, fraud, unauthorized interception of communications, inducement of or knowing participation in a breach of confidence, and other means either wrongful in themselves or wrongful under the circumstances of the case." *Astoria Indus, of Iowa, Inc. v. SNF, Inc.*,223 S.W. 3d 616, 636 (Tex. App.--Fort Worth 2007, pet. denied).  Restatement of Torts § 757, comment f defines "improper means" as "[m]eans which fall below the generally accepted

standards of commercial morality and reasonable conduct."  "'The mere fact that the means by which a discovery is made are obvious . . . cannot . . . advantage the competitor who by unfair means, or as the beneficiary of a broken faith, obtains the desired knowledge without himself paying the price in labor, money, or machines expended by the discoverer.'"  *K&G Oil Tool & Serv. Co. v. G&G Fishing Tool Serv.*, 158 Tex. 594, 314 S.W. 2d 782, 788 (Tex. 1958), *cert. denied*, 358 U.S. 898 (1958).  "[T]he mere fact that knowledge of a product may be acquired through lawful means such as inspection, experimentation, and analysis does not preclude protection from those who would secure that knowledge by unfair means. . . .  The question is not how could Astoria have secured the knowledge, but how did it?"  *Astoria Indus.*, 223 S.W. 3d at 637 n.74, *citing K&G Oil Tool*, 314 S.W. 2d at 788, and *Am. Derringer Corp. v. Bond*, 924 S.W. 2d 773, 777 (Tex. App.--Waco 1996).  Apart from any written contract, one of the duties that arises upon formation of an employment relationship forbids an employee from using confidential or proprietary information acquired during the relationship in a manner adverse to the employer.  This obligation survives termination of the employment."  *T-N-T Motorsports, Inc. v. Hennessey Mortorsports, Inc.*, 965 S.W. 2d 18, 21-22 (Tex. App.--Houston [1[st] Dist.] 1998), *citing Miller Paper Co. v. Roberts Paper Co.*, 901 S.W. 2d 593, 600 (Tex. App.--Amarillo 1995, no writ).  Moreover where a competitor woos an employee away from his original

employer in an effort to gain knowledge that was confidentially disclosed to that employee by his original employer, the competitor may be enjoined from enjoying the competitive advantage gained by misappropriating trade secrets. *Bryan v. Kershaw*, 366 F.2d 497, 501-02 (5th Cir. 1966),*cert. denied*, 386 U.S. 959 (1967). "Texas law recognizes that '[e]ven apart from any written contract, a fiduciary relationship arises from an employment relationship forbidding an employee from using trade secrets or confidential or proprietary information in a manner adverse to the employer.'" *Advanced Nano Coatings, Inc. v. Hanafin*, 478 Fed. Appx. 838, 847 (5th Cir. May 31, 2012), *citing Mabrey v. SandStream, Inc.*, 124 S.W. 3d 302, 316 (Tex. App.--Fort Worth 2003, no pet.).

Protection for a trade secret is limited to the time that competitors fail to duplicate it by legitimate, independent research. *University Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 534 (5th Cir. 1971).

Once a jury determines that a trade secret exists and was wrongfully misappropriated, the Fifth Circuit has noted that it is generally accepted that the measure of damages may be calculated by reference to patent cases. *University Computing*, 504 F. 2d at 535. The Fifth Circuit emphasized that the standard "is very flexible." *Id.* Some courts attempt to measure the loss suffered by the plaintiff. *Id.* The Fifth Circuit observed, however, that "in most cases the defendant has utilized the secret to his advantage with

-45-

no obvious effect on the plaintiff save for the relative differences in their subsequent competitive positions." *Id.* Thus "normally the value of the secret to the plaintiff is an appropriate measure of damages only when the defendant has in some way destroyed the value of the secret.  The most obvious way this is done is through publication, so that no secret remains.  Where the plaintiff retains the use of the secret, as here, and where there has been no effective disclosure of the secret through publication the total value of the secret to the plaintiff is an inappropriate measure." *Id.* Thus "unless some specific injury to the plaintiff can be established--such as lost sales--the loss to the plaintiff is not a particularly helpful approach in assessing damages." *Id.* at 536.

Where the secret has not been destroyed and where the plaintiff has not been able to show a specific injury, by analogy to patent law the appropriate measure of damages is not the loss to the plaintiff, "'but rather the benefits or profits, or advantages gained by the defendant in the use of the trade secret.'" *Id.,* citing *International Industries, Inc. v. Warren Petroleum Corp.*, 248 F.2d 696, 699 (3d Cir. 1957).  The benefit to the defendant can be measured in a variety of ways. *Id.* The defendant's profit is one way, although "the Supreme Court has held in a patent case that the lack of actual profits does not insulate the defendants from being obliged to pay for what they have wrongfully obtained in the

mistaken belief that their theft would benefit them." *Id., citing In re Cawood Patent*, 94 U.S. 695 (1877).  The reasoning behind this concept is "that the risk of defendants' venture, using the misappropriated secret, should not be placed on the injured plaintiff, but rather the defendants must bear the risk of failure themselves."  Therefore, "the law looks to the time at which the misappropriation occurred to determine what the value of the misappropriated secret would be to a defendant who believes he can utilize it to his advantage, provided that he does in fact put the idea to a commercial use," a measure dubbed the "reasonable royalty" standard by the Fifth Circuit.  *Id.*  The panel explains,

> Originally this measure was intended to deal with the situation where the misappropriated idea is used either to improve the defendant's manufacturing process, or is used as part of a larger manufactured product.  In the early case of *Egry Register Co. v. Standard Register Co.*, 23 F.2d 438 (6th Cir. 1928), a patent infringement case, the defendant manufactured and sold cash registers which in part used a device developed by the plaintiff to roll paper through the machine.  The trial court had awarded the plaintiff the total profits the defendant had made on all sales of the machines using this device.  The Sixth Circuit Court of Appeals held this measure of damages was inequitable, because the device was only a part of the larger product sold by the defendant.  Because no actual apportionment of profits based on what percentage of the success of the marketing of the machines was due to the plaintiff's device could be shown, the court held that the proper measure of damages would be a reasonable royalty on defendant's sales, thereby creating an apportionment of profits based on an approximation of the actual value of the infringed device to the defendant.

*Id.* at 536-37.  Thus the court should create the fiction that a license was to be granted at the time the misappropriation occurred

and, in a willing buyer-willing seller test, estimate what the parties would have agreed upon in trying to reach an agreement. *Id.* 537.

The Fifth Circuit concluded from its review of case law "that every case requires a flexible and imaginative approach to the problem of damages" and that "'each case is controlled by its own peculiar facts and circumstances.'" *Id.* at 538, *citing Enterprise Manufacturing Co. v. Shakespeare Co.*, 141 F.2d 916, 920 (6th Cir. 1944). From its research it found

> that most courts adjust the measure of damages to accord with the commercial setting of the injury, the likely future consequences of the misappropriation, and the nature and extent of the use the defendant put the trade secret to after misappropriation. Naturally in some cases the damages will be subject to exact measurement, either because the parties had previously agreed on a licensing price . . . or because some industry standard provides a clear measure. Where the damages are uncertain, however, we do not feel that the uncertainty should preclude recovery; the plaintiff should be afforded every opportunity to prove damages once the misappropriation is shown.

*Id.* at 538-39.

## B. Defendants' Motion for Partial Summary Judgment based on Lack of Competent Evidence (#140)

Defendants move for partial summary judgment on misappropriation of trade secrets and related conspiracy claims on the grounds that "there is no competent evidence (1) that trade secrets or other protectable property exists; (2) that Defendants acquired any trade secrets through a breach of a confidential

relationship or other improper means; (3) that Defendants used any trade secrets allegedly belonging to Ultraflo; and (4) that plaintiff suffered any damages as a result." #140 at p.9.

Ultraflo claims that Defendants misappropriated the basic dimensional information for Ultraflo's nonpatented Series 390 butterfly valve. In their motion (#140), Defendants argue there are no viable trade secrets or any other proprietary information here to support the claims of misappropriation of trade secrets and related civil conspiracy, i.e., a "fatal flaw." They assert that Ultraflo's "'trade secret' claim . . . is . . . a thinly veiled attempt by Ultraflo . . . to discourage fair competition for sale of products that have long been in the public domain." #140 at p.1. They contend that the size and shape of Defendants' Series 390 butterfly valve cannot be protected as a trade secret because the publicly sold valve can be lawfully acquired and easily copied by others and that Ultraflo has conceded this fact.[20] In addition, they maintain that Ultraflo has failed to treat its dimensional information as a trade secret, as required by Texas trade secret law.

---

[20] Defendants comment, "Simply put, dimensional information for a butterfly valve is nothing more than the measure of the size and shape of the butterfly valve, which is publicly disclosed by the butterfly valve itself" and thus "inherently not secret." #140 at p.3. That drawings of a publicly available object "happen to look similar" to the object "is not evidence of theft of anything proprietary--but rather is the function of the geometry of the object being drawn." *Id*.

Defendants explain that butterfly valves are mechanisms used to control the flow of liquids and solids in and out of transportation tanks and containers, e.g., tanks on trucks or trains. As a long established product in the United States and worldwide, there are standard sizes for tank inlets as well as performance requirements for valves, conduits, and related seals established by the transportation tank industry. Defendants state,

> This means that the size, shape, and materials of construction for valves, conduits, and seals used on transportation tanks and the like are set to various industry standards and the dimensional measurements are widely known, used and disseminated amongst those in the industry. As a result, the butterfly valves commercially offered are so similar that several manufacturers, including Ultraflo, tout their butterfly valves to be "interchangeable" with competitors' valves--a point Ultraflo concedes (Docket No. 86, p. 11). Thus once a customer has purchased a particular manufacturer's butterfly valve, that same customer can later replace various worn out component parts on the butterfly valve with new parts offered by a competitor. This interchangeability between different brands of butterfly valves is indicative of the lack of value of any dimensional related information for valves of this type.

at pp. 1-2. Defendants contend that because these commercially available butterfly valves are basically the same in operation, manufacturers rely mainly on their pricing and salesmanship, not on proprietary information, to draw customers. Worldwide and Ultraflo are competitors in the transportation tank industry. Defendants argue that because there are no applicable patents to enforce, Ultraflo has contrived allegations of trade secret misappropriation against Defendants in an effort to bully them from further market

-50-

competition.

Furthermore, claim Defendants, Ultraflo has not shown that reasonable precautions[21] were used to guard the alleged secrecy of any information it views as trade secret; instead the evidence demonstrates beyond any reasonable factual doubt that (1) the dimensional information for the 390 valve is readily ascertainable (and therefore easily copied) and has been generally known in the industry for more than a decade; (2) the 390 valve was copied from a butterfly valve of a pre-existing competitor (Keystone) when Ultraflo was founded,[22] and several Ultraflo competitors, including former employees, adopted its dimensional information over a decade ago; (3) the 390 valve does not encompass any information that gives Ultraflo any opportunity to obtain an advantage over competitors; and (4) the drawings for the 390 valve were openly and indiscriminately disseminated by Ultraflo to its competitors, vendors, and even prospective vendors for price quotations. Moreover, providing a number of examples, as noted Defendants insist that the parts of the 390 butterfly valve, indeed the valve itself, are interchangeable with competing valves, reflecting a

---

[21] In addition to those precautions already mentioned, the Court notes that Lurk's declaration (Ex. F at ¶ 20) states, "All visitors to Ultraflo's facility must check in up front.  For the most part, all visitors to the working area must be escorted by an Ultraflo employee."

[22] Defendants also argue that Ultraflo's 390 valve does not embody any improvements over the Keystone valve or any other valve that would provide it with any advantage over its competitors.

lack of any commercial advantage or value that is required to be a trade secret.

Regarding Ultraflo's failure to exercise reasonable precautions internally to protect its drawings, Defendants assert that Ultraflo does not limit access of any of its drawings to particular employees. Lurk Dep., Ex. B at 61:14-24. It freely disseminates its drawings to prospective vendors without confidentiality agreements. *Id.* at 32:17-34:14. Mueller operated without nondisclosure and non-compete agreements, and he was not an officer or shareholder of Ultraflo. Nor does Ultraflo show any protocol for maintaining trade secret information and other proprietary information at its business premises in Ste. Genevieve, Missouri. *Auto Wax Co., Inc. v. Byrd*, 599 S.W. 2d 110, 112 (Tex. Civ. App.--Dallas 1989)(party made no effort to keep formulas secret when they "were kept in an unlocked file cabinets where, during office hours, anyone, employees as well as customer, had access to them." With supporting documents Defendants maintain that because Ultraflo widely disseminated the alleged secret drawings to vendors, prospective vendors and manufacturers of valve products, and even at times to competitors, with no nondisclosure requirements or other restrictions, Ultraflo cannot in good faith claim trade secret protection for them.

Defendants further complain in both their motion and their reply (#153) and demonstrate that Ultraflo has continually

redefined "trade secrets" as this litigation evolved. *See* #140, pp. 5-7. They complain that Ultraflo's claimed protectable information is amorphous and not defined in any manner protectable under Texas law.

They also highlight the fact that in his twelve years of employment with Ultraflo, Mueller never signed a covenant not to compete, nor any confidentiality agreements or nondisclosure agreements, nor work-for-hire agreements with Ultraflo. Moreover, of the three sheets of drawings that Ultraflo claims are trade secrets, two were created after Muller resigned and thus he could not have breached any confidential relationship or wrongfully acquired them.

Defendants maintain that the drawings list dimensions that are readily measurable with micrometers/calipers and they can be copied by taking measurements of the readily available butterfly valve. "Where an item in general circulation is unprotected by patent, '[r]eproduction of a functional attribute is a legitimate competitive activity.'" *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 164 (1989), *quoting Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 863 (1982). *See also Wissman v. Boucher*, 240 S.W. 2d 278, 280 (Tex. 1951)("Matters which are completely disclosed by the goods which one markets cannot be his secret."); *Rimes v. Club Corp. of America*, 542 S.W. 2d 909, 913 (Tex. Civ. App.--Dallas 1976, writ ref. n.r.e.)("Information that

can be discovered by proper means and readily duplicated without involving considerable time, effort and expense generally will not be afforded trade secret protection.").

Defendants charge that Ultraflo voluntarily gave its 390 valve drawing to its own competition. For example David Sisk, founder of Ultraflo, sold Ultraflo, started a competing company called Sure Seal Incorporated, and purchased another called Ozora Tool and Machine Company ("Ozora"). Ozora became Ultraflo's vendor for machining 390 valve housings. Once Sisk purchased Ozora, he had full access to all the drawings that Ultraflo supplied to Ozora, as therefore did competitor Sure Seal.

Defendants also contend that trade secret laws cannot be used to prohibit reverse engineering. *Bonito Boats*, 489 U.S. at 160, *citing Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 476 (1974). Once Ultraflo made its 390 commercially available, anyone could purchase it and reverse engineer it in a matter of days, as Ultraflo proved in its internal inspection record for the Pelican valve. Ex. I.

Defendants insist that the Pelican valve did not benefit from any unlawfully appropriated proprietary information; Ultraflo's internal studies show that the dimensions of the Pelican valve do not correspond to the dimensions of the 390 valve at many points, demonstrating that it was not produced by Mueller using Ultraflo's drawings. Ex. H at PEL000933; Ex. I at ULTRAFLO 00097-106

(Inspection report, dated 08/03/07-08/06/07); Ex. OO, expert report of George Moran, P.E. Furthermore Worldwide's 190 valve is different in construction. Ex. I at ULTRAFLO 00097-98; Ex. L at PEL000125-127; Ex. O at PEL000108; Ex. Q (Hemman Dep. at 34:24, 35:8). Ultraflo cannot demonstrate any of the critical elements for trade secret misappropriation, i.e., the existence of a trade secret, improper discovery of a trade secret, or improper use of a trade secret. Moreover Defendants assert that the information employed by Mueller in developing Worldwide's drawings was information generally known in the relevant industry.

Finally Ultraflo has not produced evidence that it has been damaged commercially or that any of its alleged trade secrets have any value. Instead, its own testimony is that it is not seeking damages for lost sales or lost profits (#69), but seeking only disgorgement, conclusively negates such proof. They insist that Ultraflo's claimed trade secrets lack any meaningful commercial value and are void of any competitive advantage because the 390 valve information is generally known in the industry and available to Ultraflo competitors, whose valves are interchangeable with the 390 valve. *See* Ex. B, 83:19-84:25, Dep. of Ultraflo's corporate representative).

## C. Ultraflo's Response (#147)

Ultraflo contends that Mueller stole Ultraflo's drawings when he left Ultraflo's employment and joined Worldwide to develop a

competing line of valves.   The focus should be on Defendants' unlawful obtaining of the dimensions through theft.

Ultraflo argues that the industry standard dimensions simply require the design of the valve to interact with whatever it is connected to; the end user needs to know that the valve will connect to the flange for which it is intended. Exs. F-I. Therefore like most valves in the industry, Ultraflo's valve top plates have industry standard drilling for manual operator and interchangeability.   Ultraflo follows the flange or connection industry standards and publishes those dimensions, like everyone else in the field.

The key is that Ultraflo does not publish the dimensions of its valve's internal workings and components, and therefore the published information is useless for the purpose of manufacturing components making up the assembly.   Its own expert states that the industry standards and marketing material provide only superficial "envelope dimensions" and that one would not be able to create a manufacturing drawing from that information alone.  Ex. B, George Moran Dep. at 34:21-25; 35:4-22; 59:17-60-60:22; 97:23; 98:4-19; 126:17-20.  See also testimony of engineering expert Jack Miller that the primary purpose of the marketing material is to specify the interfaces with other equipment and make sure the valves are operable in service; it does not describe how to manufacture a working valve.  Ex. G.  The same is true of the Ultraflo and

Pelican brochures. *Id.* The dimensional information available addresses only external assembly, not the mating of internal components, a significant obstacle to would-be copycats.

Citing Mueller's deposition, Ex. A, and questioning his credibility, Ultraflo points out that before Mueller came to work for Ultraflo in his first job after obtaining an industrial management and mechanical drafting degree, he had only minimal experience with machining, manufacturing, or creating drawings of butterfly valves. At that time Ultraflo had been in business for six years and had been selling butterfly valves targeted for the bulk haul trailer industry since it began. During his initial months with Ultraflo, Mueller claims he that he noticed that Ultraflo's valve needed improvements and so he took on the responsibility for improving the valves and creating machine drawings and tolerances. Mueller states that, with just six months' experience, and in his spare time, in essence he created the manufacturing drawings in dispute here. Ex. A at 18:13-19:2; 51-57; 72:2-73:1.

Furthermore, Ultraflo emphasizes that it continued to modify and improve the design of its valve over time, as even Mueller concedes. Mueller Dep. at 118:21-23; 136:19-21 ("It's all based of what--I mean, there's been so many things added and dimensions changed from the original."); *id.* at 147:9-15 ("There was problems and issues with different dimensions that I was having, so I

started from a clean slate and made this title block and made all these changes to make the next generation drawing, which is still-- has been regurgitated and had revisions made to and is what is used today [*sic*].")' *id.* at 157:19-23 ("Well, I don't know what they've done since I've left with the drawings, but they're--the drawings of when I left are based off these dimensions and tolerances [the copyrighted drawings] that were changed and altered and added to better the product."); *id.* at 194:2-11. *See also* Ex. C, Montgomery Dep. at 73:8-74:4.

Ultraflo claims that it is always seeking new manufacturing techniques and invests substantially in tooling to maintain its competitive edge. Lurk Dep., Ex. F.  The continued improvement of the Series 390 valve (Ex. F; Moran Dep., Ex. B at 104:4-17) exemplifies this effort to incorporate the latest technology to keep Ultraflo ahead of its competitors.  With the improvements came numerous dimensional changes and the bettering of machining and finishes, as the variability of components and mating components has narrowed.  Ultraflo acknowledges that Mueller contributed to that improvement; in the mid-1990's he was promoted from plant manager to "research and development" and "product development." Mueller's Dep., Ex. C at 89:11-12.[23]

---

[23] Maintaining that his work on refining Ultraflo's butterfly valve was his own, Mueller testified that he was not doing the design work as an employee of Ultraflo, but on his own time, not part of his job duties and responsibilities, and unknown by anyone at Ultraflo other than Denny Tenhoff.  *Id.* at 59:25-60:25; 53:16-

Contrary to Defendants' insistence that Mueller was not bound
by any confidentiality agreement, Ultraflo points out that Mueller
signed at least two documents requiring Mueller to keep Ultraflo
information secret.  Exs. A-3 at ULTRAFLO 00013 (Pentron Inc. Code
of Ethics)[24] and A-5 (Ultraflo Corporation Employee Handbook).

_____

55:18; 57:13-24; 59:25-60:25.

[24] Defendants object that Pentron was not Mueller's employer
and thus this document is irrelevant.  Mike Lurk's declaration,
#147-8, Ex. F at ¶ 11, explains,

> [O]n information and belief, Ultraflo believes David Sisk
> started out with a bulk trailer repair facility, Tank
> Truck, Inc.  He then started Ultraflo as a separate
> company to produce butterfly valves used by Tank Truck,
> Inc. for repair and resale.  Bill Ylvisaker either
> already had several other repair facilities, or purchased
> them afterwards and operated them under the name
> "Penske."  . . .  Ultraflo still operated under the
> separate name of Ultraflo.  After a short time, the
> licensing fees were adding  up so the Penske locations
> were re-named Pentron.  Ultraflo, however, stayed
> Ultraflo.  In 1995, the Pentron locations were sold to
> Polar Manufacturing.  Ylvisaker retained Ultraflo until
> 1999 when he sold it to Bray International, Inc.

In ¶ 24, he declared,

> I originally testified I was not aware of a document
> [confidentiality agreement] signed by Mueller.  The
> absence of a signed document was curious, because when
> Bray International, Inc. acquired Ultraflo in 1999, all
> the employees had to sign confidentiality agreements
> before they were granted email access.  All of the
> Ultraflo employees had an executed version except for
> Mueller.  After my deposition, I checked again for a
> signed documents [*sic*] and located Exhibits A-3 and A-5.

The Court notes that A-3 was signed by Mueller on March 17, 1993
and A-5, on June 23, 1995. and the receipt referenced it as "the
handbook for **PENTRON, INC.** employees, dated April 10, 1995,"
although the Handbook is titled, "ULTRAFLO COPRORATION EMPLOYEE

Furthermore, Ultraflo, responding to the contention that it sent its drawings to suppliers without non-disclosure agreements, explains that it has close relationships with the machine shops it uses.  Largo Machine Shop, Inc. is a small shop whose employees Ultraflo knows personally.  Lurk Dep., Ex. F.  The situation is similar with Rick Montgomery of Superior Machine, Inc and Gary Brown of Ozark Rubber.  Because of the intimate relationship, a nondisclosure agreement was not needed.  Moreover it states that it never sent a complete set of manufacturing drawings to any one entity.[25]  Lurk Dep., Ex. F.  Furthermore, each of these suppliers

---

HANDBOOK."

[25]   Regarding Ozora Tool, Ultraflo, #147 at 17 n.8, stated regarding the purchase of Ozora Tools by its competitor Sisk while Ozora Tools was machining housings for Ultraflo,

> Ozora Tool was originally owned by a local individual known as Rocky Thomure.  [Ex. F] He produced stems, and machined disc and body castings for Ultraflo.  Ozora Tool also machined these components for Protech.  As soon as Ultraflo was able to move the machining business elsewhere after it learned of Sisk's acquisition of Ozora Tool, Ultraflo did.  *See id.*  Ultraflo is not aware of anything Sisk did to the detriment of Ultraflo with regard to his ownership of Ozora Tool.  *See id.*  Defendants mislead the Court by making it appear that Ultraflow provided all of the valve component drawings to Ozora Tool, but can only prove Ozora Tool had access [to] the limited drawings Ultraflo provided them.

In their reply, Defendants twist this note out of context by contending, "Ultrafo also admits that its direct competitor Sure Seal Inc. had full access to the 390 valve drawings that Utraflo had provided to Ozora Tool," without identifying what those were and implying that they completely covered the purported trade secrets.  #153 at p.6.

agreed that it would never purposefully share Ultraflow drawings with Ultraflo's competitors.  Moreover, and significantly, each supplier testified during deposition that it would be unethical to do so.  *See* Ex. E, Larry Dettmer of Largo Machine's Dep. at 57:7-21; Ex. D. Gary Brown of Ozark Rubber's Dep. at 57:8-58:14; Ex. C, Richard Montgomery of Superior Machine's Dep. at 73:16-74:10 and 59:3-60:5; Ex. B, Moran Dep. at 88:17-89:18 (explaining there is a level of trust not to share drawings).[26]

Defendants, in their Reply (#153), ignore these statements and insist that Dettmer, Montgomery, and Brown stated that they had no restrictions and the information was not confidential.  They do, however, point out the Declaration of Larry Dettmer, #153, Ex. GGG, in which he declares,

> These drawings [attached as an exhibit] were faxed to me by Ultraflo.  Nothing in the referenced drawings is proprietary or confidential and Ultraflo freely communicated the attached drawings and similar drawings to me with no restrictions as to their use or dissemination.  To the best of my knowledge, the attached drawings do not encompass any form of trade secret of proprietary information.

Mueller also testified that he obtained the Ultraflo drawings

---

[26] In their reply (#153 at p.5), citing to the deposition of General Mike Lurk, Ex. YYY, Defendants claim that Lurk admitted that "no confidential relationship exists with any third party to whom Ultraflo disseminates its 390 valve drawings-destroying any claim for trade secrets."  The Court finds this statement is a misrepresentation.  Lurk stated that there were no formal nondisclosure agreements with these entities, but that "We felt that it's implied."  YYY at 25:5-21.  See pp. 38-39 and footnote 18, as well as pp. 53-54 of this Opinion and Order.

from these vendors by telling them he was in a lawsuit and needed to prove that he did the drawings and had ownership of them. Ultraflo notes that Mueller never asked the suppliers to send him the drawings as proof that they were not worthy of any protection or that the vendors freely send them to anyone who asks.  They maintain that Defendants' ability to obtain them in the process of this litigation is not evidence of availability to the general public.

At his deposition, Mueller testified that a Mr. Hoffman contacted Mueller while Mueller still worked for Ultraflo and asked him to be a consultant for Worldwide "on the side," i.e., part-time, while Muller continued to work for Worldwide.  Mueller Dep., Ex. C at 42:25-44:1-2.  Mueller stated that he told Hoffman that he did not "feel comfortable doing it while [he] was working at Ultraflo even though [he] did not have any agreements."  *Id.* at 44:18-23.  Mueller said that Hoffman then told him that if he left Ultraflo, Worldwide would hire him as a consultant.  *Id.* at 45:11-21.  Mueller went to work at Worldwide immediately after he resigned at Ultraflo.  *Id.* at 25:19-21; 46:1-8.  Worldwide put him in charge of developing a valve that would compete with Ultraflo's 390 Series, "the basic resilient-seated valve that's used in the bulk tank industry."[27]  *Id.* at 34:23-35:23; 39:5-23; 42:11-42:24. He began working on Worldwide's competing valves within two to two-

---

[27] Ex. C at 39:12-13.

and-a-half months.   *Id.* at 48:12-17.   Muller testified that Worldwide did not have a complete valve that used a seat before he came.   *Id.* at 39:16-23.   Garth Belue, Worldwide's president, also testified that Worldwide did not have a valve to compete with the 390 before Mueller came to Worldwide.   Ex. I, 52:18-53:9. Ultraflo's expert Jack Miller testified that based on virtually identical dimensional callouts, view placement, notes on the drawings and very similar dimensional tolerances, as well as the differences being largely cosmetic and insignificant, it was more likely than not that Worldwide's drawings were the result of intimate knowledge of and copying from Ultraflo's drawings and products.   Jack Miller's Report, Ex. G-1 at 3.   Mueller also testified that for the modifications he made on Worldwide's valve he used drawings ("Mueller 2") made while he worked at Ultraflo. *Id.* at 154:16-155:6.   Thus Ultraflo maintains that its evidence raises genuine issues of material fact as to whether Mueller misappropriated Ultraflo's 390 valve.

To Defendants' claim that Ultraflo cannot show damages, Ultraflo points out that Worldwide has admitted that it made a profit from its butterfly valve that competes with Ultraflo's valve.   Exs. H and H-1 (sealed).[28]   Ultraflo further claims that

---

[28] Exhibit H is a declaration of attorney Travis Crabtree stating *inter alia* that (1) H-1 is a true and correct copy of the spreadsheet summary produced by Defendants and showing profits Worldwide allegedly received as a result of their valve that is compatible with Ultraflo's 390 Series; and (2) H-2 is comprised of

Mueller received a salary that came in part from his use of the stolen drawings.  Ex. H-2.  In spite of increased material costs, Ultraflo also has been unable to raise its cost because Defendants have undercut Ultraflo's pricing, thus negatively affecting its profit margin.  Lurk Dep., Ex. F.  It is difficult to pinpoint each sale lost or the amount of profits Ultraflo might have been able to obtain if Pelican's alleged wrongful obtainment of Ultraflo's trade secrets had not occurred.  Thus Ultraflo seeks injunctive relief as well as disgorgement.

In sum, Ultraflo contends that it has raised genuine issues of material fact for trial as to whether (1) the Ultraflo drawings and dimensions raise to the level of trade secrets; (2) Ultraflo has taken reasonable steps to protect the trade secrets; (3) the information has been publicly disclosed; (4) Mueller wrongfully used the trade secret; and (v) Ultraflo has been damaged.  Given the substantive law cited by the Court earlier in this Opinion and Order, and the evidence presented by Ultraflo, the Court agrees. Therefore it denies the second motion for partial summary judgment. **VI.  Tank and Mueller's renewed motion for partial summary judgment (#142)** argues that they have conclusively negated essential elements of trade secret misappropriation and conspiracy claims against the two of them.

---

true and correct copies of Mueller's W-2s, indicating income paid to him by  Worldwide that were produced by Defendants here.

The Court does not reiterate allegations and matters discussed *supr* but incorporates them as they apply to the instant motion.

## A. Tank and Mueller's Motion

Defendants assert that Tank is not associated in any way with Worldwide[29] or Mueller.  Moreover, because Tank has not engaged in any business, has no employees, and has never manufactured or sold anything, there is no evidence to support the misappropriation claim against it.  They further argue that Mueller was a salaried employee of Worldwide and never made any profits from sales of valves, and thus any profits Worldwide gained because of the butterfly valve are the sole earnings of Worldwide, and not of Mueller.  Each cause of action brought by Ultraflo involves matters unrelated to Tank and should be dismissed as to Tank, as should Ultraflo's only claim against Mueller for damages in the form of profit disgorgement.  Because Mueller left Worldwide in 2009 and is no longer in the valve business, injunctive relief would be moot.

## B. Ultraflo's Response (#152)

Utraflo argues that Defendants should not be able to benefit from their failure to identify the proper party, Worldwide, in this case.  Had they disclosed the identity of Worldwide at the outset,

---

[29] They point out that Tank is a Texas corporation wholly owned by Belue (#142, Ex. I (Articles of Incorporation of Tank), while Worldwide is an unrelated Texas Corporation owned by Pelican, Holdings, b.v.  Belue Decl.  When Mueller was hired by Worldwide in September 2005, Tank had not yet been formed.  #142, Ex. K (Texas Certificate of Incorporation for Tank).

the issue would have been moot; they failed to do so and now seek to have Tank dismissed in this motion, and Worldwide dismissed under a statute of limitations defense in another motion, and for lack of evidence in another. Ultraflo has alleged facts and provided evidence that Tank and Mueller tried to conceal the roles and relationships of the parties contrary to Texas law, and provides even more in this response. They reiterate that Belue, with the same address, is the registered agent and the only listed director for Tank and Worldwide and insist that Tank and Worldwide are "related" companies. Worldwide was aware of this suit and paid for the defense the entire time it was pending. Belue testified that he is the owner and the person who set up Tank. Ex. C, 20:12-25.

Moreover there is evidence of damages against Mueller, who was hired to bring his knowledge of Ultraflo's valve to Worldwide, did so, was compensated, and therefore profited from the alleged misappropriation of Ultraflo's trade secrets. Utraflo has raised genuine issues of material fact over Mueller's role in the alleged misappropriation. Moreover, under conspiracy law, Mueller is jointly and severally liable.

Mueller left Utraflo and went to work for Worldwide in 2005. As this Court has indicated, limitations bars the conspiracy claim for conduct prior to March 2007.

Moreover, given the "flexible" standard for misappropriation

-66-

of trade secrets established by the Fifth Circuit in *University Computing*, 504 F.3d at 535-39, Utraflo may go forward with its claim against Mueller for damages for misappropriation.

As for injunctive relief, as pointed out by Utraflo, even though Mueller may now be working in construction and not making or designing valves, without an injunction there is nothing to stop him from taking the same drawings produced in this case and going to another Utraflo competitor, nor evidence that he has not already done so.

**ORDER**

For reasons indicated above, the Court finds that Ultraflo has asserted some plausible claims against each of the three Defendants and accordingly

ORDERS the following:

(1)   Defendants Pelican Worldwide, Inc. ("Worldwide"), Pelican Tank Parts, Inc. ("Tank"), and Thomas Joseph Mueller's ("Mueller's") renewed motion for partial summary judgment (instrument # 138) on limitations grounds is GRANTED in part and DENIED in part, as indicated;

(2)   Tank, Worldwide, and Mueller's renewed motion for partial summary judgment (#140) on the grounds that there are no trade secrets or other proprietary information that would support a claimed misappropriation of trade

-67-

secrets and civil conspiracy is **DENIED**; and

(3) Tank and Mueller's renewed motion for partial summary judgment (#142) that they have conclusively negated essential elements for Utraflo Corporation ("Utraflo") to establish causes of action against them and there is no evidence to support any essential element of injunctive relief or damages against Mueller is DENIED.

**SIGNED** at Houston, Texas, this  22nd  day of  February , 2013.

_____
MELINDA HARMON
UNITED STATES DISTRICT JUDGE